IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
SOUTHERN DIVISION
AT CHATTANOOGA

| | |
|---|---|
| AMY BURT, in her capacity as Administrator and Personal Representative for the Estate of TIMOTHY BURT, deceased,<br><br>    Plaintiff,<br><br>vs.<br><br>HAMILTON COUNTY, TENNESSEE, and HAMILTON COUNTY SHERIFF JIM HAMMOND (in both his official Capacity and individually),<br><br>    Defendants. | No. 1:23-cv-00192-CEA-CHS<br><br>Judge Atchley/Mag. Judge Steger |

## MOTION FOR SUMMARY JUDGMENT OF HAMILTON COUNTY AND SHERIFF JIM HAMMOND

Hamilton County, Tennessee ("Hamilton County" or "the County") and Sheriff Jim Hammond ("Sheriff Hammond") show the following in support of its Motion for Summary Judgment:

Summary judgment is proper because there is no genuine issue of any material fact and because Hamilton County and Sheriff Hammond are entitled to summary judgment as a matter of law, as set forth in the Memorandum in Support.

### I. STATEMENT OF MATERIAL FACTS

1. On June 28, 2022, Timothy Burt (Mr. Burt) was discharged from medical care at the DeKalb Medical Center ("DMC") in Fort Payne, Alabama (Declaration of Donald Schrupp, Exhibit A - Quality Correctional Health Care ("QCHC") Records, Pp. 190 – 194).

2. According to the Erlanger record, "His sister and brother-in-law have been taking care of him since yesterday; however, they are unable to further take care of him as he frequently roams and gets into things that he should not get into. Brother-in-law is concerned as it appears that he has no inhibition and they are unable to keep him out of the house as they are concerned for their safety as well as his safety." (Schrup Dec., QCHC Records, Pp. 184 – 188, 190).

3. On June 29, 2022, family members took Mr. Burt to Erlanger Medical Center ("Erlanger") in Chattanooga, Tennessee. (Complaint, Doc. 1, PageID #: 4, ¶ 10).

4. On June 30, 2022, without being discharged from Erlanger, Mr. Burt stole a Puckett ambulance, eventually striking a Chattanooga Police Department patrol vehicle. (Schup Dec., QCHC Record; Declaration of Captain Rodney Terrell, Exhibit A – Affidavit of Complaint).

5. After the theft of the ambulance, Mr. Burt was returned to Erlanger. (Complaint, Doc. 1, PageID #: 4, ¶ 10).

6. As part of his intake and booking, Mr. Burt received a medical screening at intake, documented by the Inmate Risk Assessment Form (signed by Mr. Burt), which is made a part of the medical file. (Schrup Dec., QCHC Records, P. 518).

7. This screening consisted of questions relative to Mr. Burt's health condition at the time. *Id.*

8. Mr. Burt indicated that he did not need emergency medical attention prior to entering the Jail, that he was currently under a doctor's care and that he was currently prescribed medication and he signed the documentation. *Id.*

9. Mr. Burt's QCHC digital records begin on July 5, 2022. (Schrup Dec., QCHC Records, Pp. 531 - 539).

10. Mr. Burt's QCHC records further document medication that he had been prescribed at Erlanger: 81 mg aspirin, atorvastatin, Symbicort, carvedilol, tamulosin. (Schrup Dec., QCHC Records, Pp. 519 – 530).

11. Mr. Burt's QCHC records contain records from Erlanger. (Schrup Dec., QCHC Records, Pp. 511 – 516).

12. Mr. Burt's QCHC records contain records from DeKalb Medical. (Schrup Dec., QCHC Records, Pp. 150 - 183).

13. The Erlanger records are signed by Cheyenne Hux, the then nurse-manager of the clinic, and were hand-dated 7-7. *Id.*

14. The QCHC records document Mr. Burt's medication administration while he was at the Jail. (Schrup Dec., QCHC Records, Pp. 226 – 509; 202 – 222; 132 – 138; 104 – 124; 33 – 53; Exhibit B – Medication Administration Record ("MAR")).

15. These records indicate that two of Mr. Burt's medications, Symbicort and Carvedilo, were prescribed for twice per day. *Id.* (Schrup Dec., QCHC Records, Exs. A and B).

16. QCHC staff, then, saw and interacted with Mr. Burt at least twice per day. *Id.*

17. On July 14, 2022, the Bravo Shift Brief reflects the following: "7. Inmate Burk in G4 complained of chest pains he was seen and cleared by medical."[sic]. (Terrell Dec., Exhibit D, P. 12).

18. On July 20, 2022, the Delta Shift Brief reflects the following: "9. Outside citizens called requesting welfare checks on Birt (575073) he is fine." [sic]. (Terrell Dec., Exhibit F, P. 16).

19. On August 27, 2022, at approximately 0400 hours, Mr. Burt was reported to have chest pains. (Declaration of Sergeant Tyler Holland, Exhibit A – Incident reports).

20. Deputy Lewis initially responded, followed by Sgt. Peery, who was accompanied by other supervisors as well as medical. *Id.*

21. Medical started doing their assessment of Mr. Burt upon their arrival. *Id.*

22. Mr. Burt was moved to RD (which is in the same building as the medical clinic) for more medical treatment. *Id.*

23. Medical determined that Mr. Burt needed to be transported by EMS (ambulance) to the hospital for additional care based on a shortness of breath and a low oxygen level. (Holland Dec.; *Id.*; Exhibit B -Critical Incident Log )

24. At approximately 0530 hours, Mr. Burt was taken to the hospital. *Id.*

25. In addition to Sgt. Peery, Sgt. Holland, Lt. Hughes and Sgt. Roberts responded to the call for assistance as to Mr. Burt. (Holland Dec., *Id.*)

26. Mr. Burt was transported to the closest hospital, Parkridge North, by Hamilton County Emergency Medical Services ("HCEMS") Medic 3. (Holland Dec. )

27. The Hamilton County Medical Examiner, Dr. Steven Cogswell, determined that the manner of Mr. Burt's death was natural. (Declaration of Tim Carroll, Exhibit A - Autopsy).

28. Specifically, Dr. Cogswell determined that the cause of death was an acute myocardial infarction, due to calcific coronary atherosclerosis, which was due to atherosclerotic cardiovascular disease. *Id.*

29. The autopsy further noted the following:
   a. Chronic alcoholism
      i. Micronodular cirrhosis
      ii. Necrosis of cerebral mammillary bodies (mild)
      iii. Multiple contusions of varying ages

   b. Chronic Obstructive Pulmonary Disease
      i. Pulmonary bullous emphysema
      ii.

30. The Sheriff's Office policies regarding medical treatment ("Medical Policies") for inmates comprises approximately one-third (1/3) of its overall policies and procedures for the Hamilton County Jail. (Terrell Dec., Exhibit G – HCSO Medical).

31. The Medical Policies are comprehensive and meet or exceed the requirements of the Tennessee Corrections Institute. (Terrell Dec.).

32. The Jail has not failed any TCI inspections due to medical-related, or any other, issues. (Terrell Dec.).

33. Hamilton County Sheriff's Office Corrections Deputies receive training that meets or exceeds the requirements of the Tennessee Corrections Institute. (Terrell Dec.; Declaration of Richard Womack).

34. Corrections deputies are trained on the Policies of the Sheriff's Office, including the medical policies. (Terrell Dec.; Womack Dec.)

35. For routine medical care that is not communicated to the deputy as urgent or emergent, pursuant to Sheriff's Office Policies, if inmates indicate a medical need or make requests for medication and so forth, they are directed to make a medical request directly to the contracted medical provider, QCHC, through the kiosk system. (Terrell Dec.; Womack Dec.)

36. For medical care that appears more urgent, either by an inmate (or fellow inmates) expressing that it is urgent, or by a deputy's own observations, deputies are trained to contact the medical providers, "medical," *i.e.*, QCHC, for more immediate attention. (Terrell Dec.; Womack Dec.)

37. For emergency medical situations, deputies are trained to contact medical for immediate medical response as well as to contact 911 for ambulance transport if the

circumstances appear to be of such a nature to require hospital evaluation and/or treatment. (Terrell Dec.; Womack Dec.)

38. Depending on the circumstances, deputies may also wait for direction from medical staff before calling 911, if they cannot gauge the extent of the medical need. (Terrell Dec.; Womack Dec.)

39. While corrections deputies are trained in basic first aid, corrections deputies are not medical providers. (Terrell Dec.; Womack Dec.)

40. The Sheriff's Office does not directly employee medical staff; rather, it contracts with QCHC for medical care of inmates. (Terrell Dec., Exhibit I)

41. The Sheriff's Office has a system by which inmates can electronically make general requests, medical requests and file grievances. (Terrell Dec.; Womack Dec.)

42. This same electronic system is where detainees and inmates place commissary orders.

43. A review of Mr. Burt's record indicates that while he used the kiosk system to place commissary orders, he did not make any general requests or medical requests. He also did not file any grievances regarding the lack of any medications. (Terrell Dec., Commissary records attached hereto as Exhibit I. Request and grievance Reports attached hereto as Collective Exhibit J).

44. Hamilton County Sheriff's Office corrections deputies and civilians receive training that meets or exceeds the requirements of the Tennessee Corrections Institute. (Womack Dec., ¶ 4).

45. Corrections deputies are required to undergo pre-service training prior to being placed on duty in the Jail. (Womack Dec., ¶ 5).

46. The pre-service training consists of a mix of classroom instruction in addition to self-study. (Womack Dec., ¶ 6).

47. since at least 2016, new corrections deputies have received 240 hours of pre-service training. (Womack Dec., ¶ 7).

48. Since January of 2022, the pre-service training has consisted of 260 hours of instruction. (Womack Dec., ¶ 8).

49. As of January of 2024, the pre-service training consists of 292 hours of instruction, which includes an additional 16 hours of instruction related to intake and booking, which includes instruction related to the intake medical screening. (Womack, ¶ 9).

50. Corrections deputies also receive at least 48 hours of additional formal training annually. (Womack Dec., ¶ 10).

51. New corrections deputies who had previously worked at Silverdale as guards, were required to go through the required pre-service training as though they had not worked in a detention facility. (Womack Dec., ¶ 11).

52. Training includes instruction as to how to address medical complaints by detainees and inmates, obvious medical needs regardless of any complaint, and medical emergencies. (Womack Dec., ¶ 12).

53. In particular, corrections deputies are trained to recognize when someone appears to need medical assistance, to the extent as would be able to be discerned by persons with the most basic first responder training, and make decisions about the course of action to be

7
Case 1:23-cv-00192-CEA-CHS    Document 30    Filed 12/23/24    Page 7 of 11    PageID #: 191

taken. (Womack Dec., ¶ 13).

54. For routine medical care that is not communicated to the deputy as an urgent or emergent, pursuant to Sheriff's Office Policies, if inmates indicate a medical need or make requests for medication and so forth, they are directed to make a medical request directly to the contracted medical provider. Quality Correctional Health Care ("QCHC") through the kiosk system. (Womack Dec., ¶ 14).

55. For medical care that appears more urgent, either by an inmate (or fellow inmates) expressing that it is urgent, or by a deputy's own observations, deputies are trained to contact the medical providers, "medical," *i.e.*, QCHC, for more immediate attention. (Womack Dec., ¶ 15).

56. For emergency medical situations, deputies are trained to contact medical for immediate medical response as well as to contact control to contact 911 for ambulance transport if the circumstances appear to be of such a nature to require hospital evaluation and/or treatment. (Womack Dec., ¶ 16).

57. Depending on the circumstances, deputies may also wait for direction from medical staff before calling 911, if they cannot gauge the extent of the medical need. (Womack Dec., ¶ 17).

58. While corrections deputies are trained in basic first aid, corrections deputies are not medical providers. (Womack Dec., ¶ 18).

59. New corrections deputies are assigned to review all policies through the PowerDMS computer program while in the pre-service academy, including medical policies. (Womack Dec., ¶ 19).

60. As to each policy, deputies are required to read the policy and indicate that he or she has read and understood the policy. (Womack Dec., ¶ 20).

61. All policies are available for deputies to review at any time. (Womack Dec., ¶ 21).

62. Any time a policy is updated, the PowerDMS system will distribute the policy for all deputies and civilian personnel to review, regardless of their length of time in service. (Womack Dec., ¶ 22).

63. If a deputy does not review the policy within a prescribed amount of time, an automated reminder will be sent to the deputy. (Womack Dec., ¶ 23).

64. If a deputy continues to not review the policy the deputy's supervisors are alerted. (Womack Dec., ¶ 24).

65. Once a deputy's supervisors are alerted that the policies have not been reviewed, a supervisor personally contacts the deputy regarding the failure to review. (Womack Dec., ¶ 25).

66. Failure to review the policies can result in disciplinary action. (Womack Dec., ¶ 26).

67. During the training academy, there is on-the job training in addition to classroom instruction. (Womack Dec., ¶ 27).

68. Once new deputies complete the training academy, they are assigned a mentor whom they shadow and continue on-the-job training for a period until they are determined by supervisory staff to have sufficient experience to work independently. (Womack Dec., ¶ 28).

69. Excerpts of written training materials as to Corrections Deputy training are attached hereto as <u>Collective</u> <u>Exhibit</u> <u>A</u>. (Womack Dec., ¶ 29).

70. 30. Civilians working at the Jail also receive training from the Jail training staff.

9
Case 1:23-cv-00192-CEA-CHS    Document 30    Filed 12/23/24    Page 9 of 11    PageID #: 193

(Womack Dec., ¶ 30).

71. Civilian training addresses several aspects of working in a Jail, including how to address medical issues in conjunction with security concerns. (Womack Dec., ¶ 31).

72. Excerpts of written training materials as to civilians employed in the Jail, including contracted medical staff are attached hereto as <u>Collective</u> <u>Exhibit</u> <u>B</u>. (Womack Dec., ¶ 32).

73. There is overlap in the training materials used to train corrections deputies and civilians employed or volunteering at the Jail. (Womack Dec., ¶ 33).

74. A substantial portion of this training is directed by the Tennessee Corrections Institute, must be approved by the TCI and has remained substantially the same over the past several years. (Womack Dec., ¶ 34)

75. Some of the referenced Exhibits are from the 2023 training sessions; however, they accurately represent the training that has been given during my tenure as training sergeant. (Womack Dec., ¶ 35).

76. Corrections deputies are trained on the Policies of the Sheriff's Office, including the medical policies. (Womack Dec., ¶ 36).

## II. CONCLUSION

Summary judgment is proper as to Hamilton County because there is no genuine issue of any material fact and because it is entitled to summary judgment as a matter of law, as set forth in the Memorandum in Support.

*Signature(s) on the Following Page(s).*

HAMILTON COUNTY ATTORNEYS OFFICE

By:    *s/Sharon M. Milling*
R. Dee Hobbs, BPR No. 10482
Sharon McMullan Milling, BPR No. 36876
625 Georgia Avenue, Suite 204
Chattanooga, TN 37402
Telephone/Facsimile: 423-209-6150/6151
Email: rdhobbs@hpamiltontn.gov
sharonm@hamiltontn.gov

**CERTIFICATE OF SERVICE**

    I hereby certify that on December 22, 2024, a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. mail or hand-delivery. Parties may access this filing through the Court's electronic filing system.

    *s/ Sharon M. Milling*