# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## AT CHATTANOOGA

| | | |
|---|---|---|
| AMY BURT, in her capacity as administrator and personal representative for the estate of TIMOTHY BURT, deceased, | ) ) ) ) ) | |
| *Plaintiff,* | ) ) | Case No. 1:23-cv-192 |
| v. | ) ) | Judge Atchley |
| HAMILTON COUNTY, TENNESSEE, and HAMILTON COUNTY SHERIFF JIM HAMMOND, | ) ) ) ) | Magistrate Judge Steger |
| *Defendants.* | ) ) | |

## MEMORANDUM OPINION

Plaintiff, by and through counsel, filed this civil rights action under 42 U.S.C. § 1983 in her capacity as the Administrator and Personal Representative of the Estate of Timothy Burt, who died on August 27, 2022, following his incarceration at the Hamilton County Jail and Detention Center (hereinafter "Jail") [Doc. 1].[1] Specifically, Plaintiff claims that (1) the policies and customs of the Hamilton County Sheriff's Office ("HCSO") caused Mr. Burt to be deprived of his constitutional rights [Count I]; (2) Defendants' failure to train violated Mr. Burt's constitutional rights [Count 2]; (3) Defendants' failure to supervise violated Mr. Burt's constitutional rights [Count 3]; and (4) Defendants were deliberately indifferent to Mr. Burt's medical needs [Count 4] [*Id.*]. Before the Court are Defendants' motion for summary judgment [Doc. 30] and supporting exhibits [Docs. 31-38]; Plaintiff's response in opposition and supporting exhibits [Docs. 45–49, 51-56, 58, 70]; and Defendants' reply and supplement [Doc. 68–69]. Upon consideration of the

---

[1] Plaintiff states in her complaint that she is Mr. Burt's sister [Doc. 1 ¶ 4]. Plaintiff's medical records indicate that Plaintiff is Mr. Burt's daughter [See, e.g., Doc. 51-1 at 86].

Parties' pleadings, the evidence presented, and the applicable law, the Court finds Defendants' motion [Doc. 30] should be **GRANTED**, and this action **DISMISSED**.

## II.    SUMMARY JUDGMENT STANDARD

Summary judgment is proper when the pleadings and evidence, viewed in a light most favorable to the nonmoving party, illustrate that no genuine issue of material fact exists, and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A fact is deemed "material" if resolving that fact in favor of one party "might affect the outcome of the suit under governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To establish an entitlement to summary judgment, the moving party must demonstrate that the nonmoving party cannot establish an essential element of their case for which they bear the ultimate burden of proof at trial.  *Celotex*, 477 U.S. at 322; *Moore v. Philip Morris Cos., Inc*., 8 F.3d 335, 339 (6th Cir. 1993).

Once the motion is properly supported with competent evidence, the nonmovant must show that summary judgment is inappropriate by setting forth specific facts showing there is a genuine issue for trial.  *Celotex*, 477 U.S. at 323; *Anderson*, 477 U.S. at 249.  The plaintiff cannot meet this burden with "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), "conclusory allegations," *Lujan v. Nat'l Wildlife Fed'n.*, 497 U.S. 871, 888 (1990), or by a mere "scintilla" of evidence, *Anderson*, 477 U.S. at 252.  If the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," then there is a genuine dispute as to a material fact.  *Anderson*, 477 U.S. at 248.  If no proof is presented, however, the Court does not presume that the nonmovant "could or would prove the necessary facts."  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citing *Lujan*, 497 U.S. at 889).

2

## II.    BACKGROUND

### A.    Circumstances Preceding and Involving Mr. Burt's Death

On May 28, 2022, sixty-five-year-old Timothy Burt was admitted to the Dekalb Regional Medical Center in Fort Payne, Alabama, complaining of chest pains and shortness of breath [Doc. 51-1 at 60].  His weight was recorded at 119 pounds a few days after his admittance [*Id.* at 57]. Mr. Burt remained hospitalized for approximately a month and was treated for, among other conditions, cardiac and pulmonary issues, sepsis, alcohol withdrawal, and delirium [*Id.* at 58, 72]. Cardiology planned to perform a heart catheterization during this hospitalization, but Mr. Burt "was too altered to do it safely" [*Id.* at 72].  Plaintiff's expert, Dr. Haggerty, opines that these events "painted a clear picture of a high probability of death in the very near and short term" [Doc. 45-1 ¶ 21].

The hospital and Mr. Burt's family worked together to attempt to get him placed in a facility upon his discharge from the hospital, but those efforts were unsuccessful [*See* Doc. 51-1 at 85–87].  And days prior to his release, the hospitalist recorded "that [Mr. Burt] is not competent to care for himself or conduct any business transactions" [*Id.* at 55].  However, with medical intervention and the absence of alcohol during his hospital stay, Mr. Burt's mental status slowly improved to the point he was deemed "safe for discharge" [*Id.* at 72].

On June 28, 2022, Mr. Burt was discharged from Dekalb, and a car provided by the hospital dropped him off at the home of his sister and brother-in-law [Doc. 51-1 at 93, 97; *see also* Doc. 45-5 ¶ 5]. The following day, family members took Mr. Burt to Erlanger Medical Center ("Erlanger") in Chattanooga, Tennessee, and requested placement for him [Doc. 51-1 at 96, 100]. According to the Erlanger record, Mr. Burt's "sister and brother-in-law have been taking care of him since yesterday; however, they are unable to further take care of him as he frequently roams

3

and gets into things that he should not get into. Brother-in-law is concerned as it appears that he has no inhibition and they are unable to keep him out of the house as they are concerned for their safety as well as his safety." [*Id.* at 96]. A physician's note documented Mr. Burt's history of alcohol use disorder and indicated that Mr. Burt was "[o]bviously confused" at the time of his admission, as he was "sitting on the ground and attempting to pull his pants down" [*Id.* at 96–97]. Mr. Burt's weight was recorded at 100 pounds at the time [*Id.* at 96]. After Mr. Burt's medical records were received and reviewed, a physician noted "concern[] that patient has Koraskoff syndrome[2] and likely needs SNF[3] placement" [*Id.* at 97].

On June 30, 2022, Mr. Burt was "hand[ed][]off" to Dr. Gray and admitted to the adult hospitalist at Erlanger [*Id.* at 97, 99]. At approximately 8:30 a.m. that morning, while still in the hospital's care, Mr. Burt walked outside, climbed in an ambulance, and drove away [Doc. 51-1 p. 99; Doc. 38-1]. Police were notified and followed Mr. Burt [Doc. 51-1 p. 99]. Eventually, the ambulance driven by Mr. Burt struck a Chattanooga Police Department patrol vehicle at a low rate of speed [*Id.* at 99]. The authorities pulled Mr. Burt out of the ambulance and returned him to Erlanger, where he was treated for his pre-existing conditions, some abrasions to the right side of his face that he presumably got "fighting with police" as he was removed from the ambulance, and a urinary tract infection [*Id.*]. The same day, Mr. Burt's sister and brother-in-law were granted temporary letters of guardianship over Mr. Burt [*See* Doc. 55-1 at 149; *see also* Doc. 45-5 ¶ 5].

Mr. Burt was discharged from Erlanger on July 5, 2022, and booked into the Jail on the charges he received as a result of taking the ambulance on June 30 [*See, e.g.*, Doc. 51-1 at 512–

---

[2] "Korsakoff's syndrome is a disorder that primarily affects the memory system in the brain. It usually results from a deficiency of thiamine (vitamin B1), which may be caused by alcohol abuse, dietary deficiencies, prolonged vomiting, eating disorders, or the effects of chemotherapy." Johns Hopkins Medicine, Korsakoff's Syndrome, https://www.hopkinsmedicine.org/neurology-neurosurgery/specialty-areas/memory-disorders/korsakoffs-syndrome (last visited Aug. 5, 2025).
[3] The Court assumes without deciding that this acronym represents "skilled nursing facility."

4

17; *see also* Doc. 38-1]. The intake officer at the Sheriff's Office completed an "Inmate Risk Assessment Form[,]" which consisted of health-related questions, on Mr. Burt [Doc. 51-1 at 519]. At that time, Mr. Burt indicated he did not need emergency medical attention, that he was not offered any medical treatment, that he was currently under a doctor's care, and that he was currently prescribed medication [*Id.*]. Mr. Burt purportedly signed the document, but the intake officer did not sign the form [*Id.*].

A medical provider from Quality Control Health Care ("QCHC"), the contract medical provider for the Jail, works each shift at the Jail [Doc. 38-7; Doc. 47-5 ¶ 10; Doc. 47 at 10; Doc. 52 at 18]. Thus, if the intake officer is alerted to an arrestee's medical issues during the intake, he or she may refer the arrestee to a nurse [Doc. 47 at 10]. But there is no indication in Mr. Burt's records that any member of the medical staff saw Mr. Burt at the time of his intake [*Id.* at 19]. Rather, the first medical entry in Mr. Burt's QCHC digital records is July 7, 2022, which is the latest date by which the Jail received Mr. Burt's discharge prescription records from Erlanger [*See* Doc. 51-1 at 511–17]. On that date, Health Service Administrator ("HSA") and Director of Nursing ("DON") Cheyenne Hux signed off on Mr. Burt's discharge prescription records [*See, e.g.,* Doc. 54 at 16; Doc. 54-1 at 511]. Ms. Hux noted that Mr. Burt was discharged from Erlanger with the following medications: aspirin, atorvastatin (Lipitor), budesonide-formoterol (Symbicort), carvedilol (Coreg), tamsulosin (Flomax), and thiamine mononitrate (vitamin B1) [Doc. 51-1 at 514]. Two of Mr. Burt's medications, Symbicort and Coreg, were prescribed twice per day [*Id.*]. Ms. Hux wrote on the summary that Mr. Burt's thiamine would be substituted with a multivitamin, but she could not recall the provider who ordered the substitution [Doc. 51-1 at 514; Doc. 54 at 16]. And the record contains no indication that Mr. Burt ever received thiamine or a multivitamin [Doc. 45-1 ¶ 16; Doc. 54 at 16–17]. However, Mr. Burt's QCHC records indicate

5

that he began receiving the other medications he was prescribed on July 7, 2022 [Doc. 34-1 at 60–66]. According to his Medication Administration Record ("MAR"), Mr. Burt continued to receive his medications, with limited exceptions where he declined to take the medications or otherwise "missed" them, until he was taken to the hospital on August 27, 2022 [Doc. 34-2; *see also* Doc. 54-1 at 338–509].

Donna King, one of Mr. Burt's sisters, called the Jail daily to check on Mr. Burt's condition and explain his medical and mental conditions, but she never received a return phone call [Doc. 45-4 ¶¶ 2, 3]. She also spoke to Mr. Burt's social worker, Exy Poloche-Harris, on several occasions, and they communicated through email during Mr. Burt's incarceration, as Ms. Poloche-Harris was attempting to get Mr. Burt medical care at the Jail and into a rehab program [Doc. 45-4 ¶ 4; Doc. 45-5 ¶ 7]. Ms. Poloche-Harris maintains that when she first met Mr. Burt on July 14, 2022, in a holding cell in general sessions court, Mr. Burt had no recollection of taking the ambulance at Erlanger [Doc. 45-5 ¶ 3]. She also states that she saw Mr. Burt in Jail on July 18, 2022, and reported to medical personnel her concerns that Mr. Burt looked unwell [*Id.*]. At some point, Ms. Poloche-Harris received via email Mr. Burt's Dekalb and Erlanger hospital records from Mr. Burt's brother-in-law[4] [*Id.* ¶ 5]. Ms. Poloche-Harris referred Mr. Burt to mental health counselor and licensed social worker, Susan Taylor, for a mental health assessment [Doc. 33 at 47; Doc. 70 at 35].

Carson Fallo, the attorney appointed to represent Mr. Burt in the criminal charges arising from the Erlanger incident leading to Mr. Burt's arrest, states that when Mr. Fallo first met with

---

[4] Ms. Poloche-Harris emailed the Public Defender's Office on August 16, 2022, requesting all Mr. Burt's medical and mental health records [See, e.g., Doc. 33-1 at 20].

6

Mr. Burt on July 14, 2022, Mr. Burt was confused "as to what was happening or why we were in court" and "could not articulate anything back" to the attorney [Doc. 45-2 ¶¶ 4, 5].

Sergeant Tyler Holland recalls seeing Mr. Burt a handful of times in his unit at the Jail, and he states that Mr. Burt never appeared unwell or in pain on those occasions [Doc. 35 ¶¶ 16-18]. Sergeant Tyler does not recall ever hearing a report that Mr. Burt was complaining of a medical need, but he was aware that Mr. Burt was being seen by medical personnel [*Id.* ¶¶ 20, 21].

Clay Autry, Mr. Burt's cellmate from July 10, 2022, until Mr. Burt left the facility on August 27, 2022, describes Mr. Burt as having "child-like qualities/mentality" and requiring "step-by-step instructions" to complete basic hygiene tasks [Doc. 45-3 ¶¶ 2, 6]. He claims Mr. Burt could not recall Mr. Autry's first name—he called Mr. Autry "Mike"—despite Mr. Autry's repeated corrections [*Id.* ¶ 4]. Mr. Autry avers that Mr. Burt was "extremely underweight" and routinely tried to give his food to Mr. Autry, stating that "had already eaten" [*Id.* ¶ 5]. But Mr. Autry knew Mr. Burt had not eaten, and, in fact, he used the kiosk to order snacks for Mr. Burt "to try to get him to eat" [*Id.* ¶¶ 5, 7]. Mr. Autry claims that Mr. Burt was incapable of understanding how to operate the kiosk, as he was "disoriented[,]" "could barely communicate[,]" and presented as "a very frail old man that did not need to be in jail" [*Id.* ¶¶ 4, 7, 9].

Mr. Autry states he told officers on more than a dozen occasions that Mr. Burt needed to be assessed by the medical staff, as he was constantly complaining of chest pain [*Id.* ¶ 9]. On three occasions, Mr. Autry allegedly beat on the cell door for twenty minutes to get help because of Mr. Burt's apparent "medical distress" [*Id.* ¶ 13]. On one of those occasions, Mr. Burt later died [*Id.*]. On one of the other occasions, staff purportedly took Mr. Burt "downstairs and brought him back

7

stating he was fine" [*Id.*]. Jail records indicate that Mr. Burt[5] was "cleared by medical" following a complaint of chest pains on July 14, 2022 [Doc. 38-3 at 12], and that officers stated he was "fine" on July 20, 2022, after officers responded to a telephone call by "[o]utside citizens . . . requesting [a] welfare check" on Mr. Burt [Doc. 38-5 at 16].

Mr. Autry states that he determined in August 2022 that he "could not just watch [Mr. Burt] die" [Doc. 45-3 ¶¶ 9, 12]. Therefore, Mr. Autry claims, on August 19, 2022, another inmate used the kiosk to report that Mr. Autry was suicidal [*Id.* ¶ 12]. When the officer came to take Mr. Autry to see the mental health counselor, Mr. Autry claimed Mr. Burt needed assistance, too [*Id.*]. Both Mr. Autry and Mr. Burt were taken to the counselor [*Id.*].

Mr. Burt was seen at the Jail by Susan Taylor the morning of August 19, 2022, in the Jail's clinic [Doc. 70 at 11–12, 30, 64–65]. Ms. Taylor reports that she began her evaluation of Mr. Burt after Mr. Autry admitted to her that he was not suicidal, and that he only stated he was to get help for Mr. Burt [*Id.* at 33]. Ms. Poloche-Harris provided Ms. Taylor with Mr. Burt's Erlanger medical records, which were scanned into Mr. Burt's Jail file on August 19, 2022 [Doc. 70 at 39; *see also* Doc. 51-1 at 189–94]. Ms. Taylor noted in her mental health appraisal that Mr. Burt was "a poor historian[,]" who presented as "emaciated and frail[,]" and that "he was not mentally or medically stable to go to a treatment center" [Doc. 70 at 47–49; *see also* Doc. 51-1 at 199–201]. Ms. Taylor testified that Mr. Burt "was extremely thin, couldn't hold his head up, could barely walk" and spoke incoherently using "word salad" [Doc. 70 at 34]. Ms. Taylor also recorded that she asked medical "to complete intake while this assessment was being done due to concerns for [Mr. Burt's] physical health" [Doc. 70 at 49; *see also* Doc. 51-1 at 201].

---

[5] The Shift Briefs refer to "Mr. Burk" in "G4" on July 10, 2022, and "Mr. Birt" on July 20, 2022, but Defendants state that no one named "Burk" was housed in G4 on the relevant date [Doc. 31 at 21 n.2].

Ms. Taylor testified that at least three nurses, a nurse practitioner, and HSA Hux were in the clinic at the time of her assessment of Mr. Burt [Doc. 70 at 34, 57]. Ms. Taylor stated that she obtained Mr. Burt's weight, which was by then 95.2 pounds, by helping him walk to the scale and holding on to him [*Id.* at 35, 63]. Ms. Taylor states that she again asked if someone would evaluate Mr. Burt that day, and she was assured that Mr. Burt would be seen [*Id.*]. But Ms. Taylor maintains she never saw anyone interact with Mr. Burt, and that an officer eventually came and took Mr. Burt and Mr. Autry back to their cell [*Id.*].

Mr. Burt's first recorded assessment by a member of the medical staff occurred on August 19, 2022 [Doc. 51-1 at 142–46]. It consists of a handwritten intake physical [*Id.*]. The record, illegibly signed, records Mr. Burt's vitals, notes that he has had hospitalizations that he cannot remember, notes that he used one-half of a case of beer (presumably daily) before he was in care, and notes that he takes medication "but 'can't remember'" [*Id.* at 142, 144]. Portions of the physical assessment, such as an assessment of Mr. Burt's heart and lungs, were not completed [*Id.* at 143]. HSA Hux signed off on the intake [Doc. 54 at 12–13].

On August 27, 2022, Mr. Autry banged on his cell door "for close to 20 minutes to get someone back" to his unit [Doc. 45-3 ¶ 14]. Jail records reflect that around 4:00 a.m. on that date an inmate reported to Deputy Lewis that Mr. Burt was experiencing chest pains [Doc. 35 ¶ 7; Doc. 35-1 at 4]. Medical personnel arrived at Mr. Burt's cell at 4:11 a.m. and began assessing Mr. Burt, who was lying on a mat on the floor [Doc. 35 ¶ 9; Doc. 35-1 at 4]. Mr. Burt was moved to the R&D unit for additional treatment [Doc. 35 ¶ 10; Doc. 35-1 at 2–3]. When medical personnel administered a breathing treatment without any improvement in Mr. Burt's condition, medical personnel determined that Mr. Burt needed to be transported to the hospital by emergency medical services ("EMS") for more treatment based on his shortness of breath and low oxygen level [Doc.

9

51-1 at 19]. At approximately 5:30 a.m., Mr. Burt was transported to the closest hospital, Parkridge North [Doc. 35 ¶¶ 11, 12, ¶ 14; Doc. 35-1 at 2; Doc. 35-2].

Parkridge records indicate that, by the time he arrived at approximately 5:44 a.m., Mr. Burt's "only complaint" was the "abscess on the back of his neck" [Doc. 45-6 at 57]. Mr. Burt did not list a next of kin with medical personnel and declined to list a contact person [*Id.* at 83–84]. The abscess on Mr. Burt's neck was drained and dressed around 7:00 a.m. [*Id.* at 12, 53, 64]. At around 11:35 a.m., Mr. Burt was moved to a room [*Id.* at 126]. At approximately 12:22 p.m., Mr. Burt was found unresponsive on the bathroom floor and a "code blue" was issued [*Id.* at 26, 38, 54, 58, 75, 126]. Mr. Burt was intubated and moved to a critical care unit [*Id.* at 8–9, 217]. Mr. Burt had another "code blue" event at 1:43 p.m. [*Id.* at 47, 75]. Lifesaving measures were attempted for approximately twenty minutes, but Mr. Burt was pronounced dead at approximately 2:03 p.m. [*Id.* at 10–11, 47, 84, 219].

The Hamilton County Medical Examiner, Dr. Steven Cogswell, recorded Mr. Burt's weight at autopsy at 94 pounds and determined that Mr. Burt's cause of death was a heart attack [Doc. 36-1]. More technically, Dr. Cogswell determined Mr. Burt died of an "[a]cute myocardial infarction" due to "[c]alcific coronary atherosclerosis" and "[a]therosclerotic cardiovascular disease" [*Id.* at 1–2]. The autopsy also noted that Mr. Burt suffered chronic alcoholism, micronodular cirrhosis, multiple contusions of varying ages, and chronic obstructive pulmonary disease [*Id.* at 1].

On August 29, 2022, unaware of Mr. Burt's death, Mr. Burt's sisters and Mr. Fallo appeared before Judge Gary Starnes in Hamilton County General Sessions Court to request Mr. Burt be released on a bond due to his medical and mental issues [Doc. 45-2 ¶¶ 7; Doc. 45-4 ¶ 8]. The judge agreed and ordered Mr. Burt released on his own recognizance [Doc. 45-2 ¶ 7; Doc. 45-

4 ¶ 5].  After the hearing, Ms. King went to the Jail to pick up Mr. Burt and learned several hours later that he had died two days earlier [Doc. 45-5 ¶ 5].

<h3 style="text-align:center">B.     Jail's Background & Relevant Policies</h3>

Prior to December 2020, the Jail, then known as "Silverdale," was operated by a contractor, CoreCivic, under the authority of the Hamilton County government [Doc. 46 at 2].  The HCSO took over operations of the Jail on December 30, 2020, and engaged QCHC as its on-site medical provider [Doc. 38-7; Doc. 46 at 3, 5, 26; Doc. 52 at 18].  When Hamilton County took over operations, there were "major building problems[,]" such as nonfunctioning lights, cameras, and doors [Doc. 46 at 9].  The County Commissioners authorized the Sheriff funds to rehabilitate the facility, but it was a "slow process" that took place incrementally [*Id.* at 9].  Jim Hammond was the Sheriff of Hamilton County during the transition, and he remained Sheriff until September 1, 2022 [*Id.* at 4, 6].  During Sheriff Hammond's tenure, the Jail was never decertified, but it never passed an initial inspection by the Tennessee Corrections Institute[6] ("TCI") [*See, e.g.*, Doc. 46-3; Doc. 46 at 7–9].

QCHC was required to followed HCSO medical policies as part of its contract [Doc. 46 at 26; *see also* Doc. 38-7 at 8].  HCSO policy 90.09.32 requires inmates to receive a "Risk Assessment," which is conducted by correctional staff, and a "Receiving Screening," which is conducted by a health provider, upon arrival at the Jail [Doc. 38-6 at 78].  The findings are then to be uploaded into the Criminal Justice United System ("CJUS")—a computer system accessible to

---

[6] "The Tennessee Corrections Institute, established by state statute, is required to establish minimum standards for adult local jails, lock-ups, workhouses, and detention facilities in the State; establishes the standards to inspect and certify local correctional facilities; is responsible for educating local correctional staff; and provides technical assistance and conducts research in relation to requests from local correctional detention facilities, the Tennessee legislature, and other state agencies." *Morrow v. Montgomery Cnty. Sheriff's Dept.*, No. 3:12-CV-801, 2012 WL 3561069, at *3 (M.D. Tenn. Aug. 16, 2012); *see also* Tenn. Code Ann. § 41-4-140.

11

anyone in criminal justice [*See* Doc. 38-6 at 77; Doc. 46 at 17; Doc. 46-1 at 71–75]. However, there is no receiving screening form in Mr. Burt's records [Doc. 47 at 19].

HCSO policy also requires an inmate to receive written medical clearance by a member of the medical staff before admittance into the Jail [*See* Doc. 38-6 at 77; Doc. 46-2 at 3; Doc. 47 at 11]. Then, pursuant to Tennessee law, TCI requirements, and HCSO policy, a full medical assessment of the inmate is required within 14 days of their arrival at the Jail [Doc. 38-6 at 79, 101, 103; Doc. 45-1 at 5; Doc. 47 at 11; Tenn. Comp. R. & Regs. 1400-01-.13]. However, HCSO policy and Tennessee law dictate that "[i]f there is documented evidence of a health appraisal within the previous 90 days, a new health appraisal is not required" unless "the responsible physician" or "medical conditions dictate otherwise" [Doc. 38-6 at 101; Tenn. Comp. R. & Regs. 1400-01-.13].

In January 2021, the Sheriff and staff began regular meetings, usually bi-weekly, to address concerns and plan improvements regarding medical care at the Jail [Doc. 46-4; Doc. 46-5; Doc. 68-1 at 7–8]. For instance, the County would hire paramedics or secure volunteers and schedule "intake" days to address untimely medical screenings [Doc. 46 at 26; Doc. 68-1 at 4–5]. An August 23, 2022, report indicates that out of 247 intakes the prior week, 100 medical screenings were late [Doc. 46 at 27]. And at the time of Mr. Burt's death, an intake day, or "catch-up" day, was scheduled for September 10, 2022 [*Id.* at 26].

The HCSO has a system by which inmates can electronically make general requests, medical requests, and file grievances [Doc. 38 ¶ 16]. Pursuant to HCSO policies, officers direct inmates to make routine medical requests directly to QCHC through the kiosk system [*See* Doc. 37 ¶14; Doc. 38 ¶ 10]. But deputies are trained to contract QCHC for immediate attention for urgent medical care, as expressed by an inmate or by a deputy's own observations [Doc. 37 ¶ 16;

12

Doc. 38 ¶ 11].  For emergency medical situations, deputies are trained to contact medical and 911 for ambulance transport, if the circumstances appear to warrant hospital evaluation and/or treatment [Doc. 37 ¶ 16; Doc. 38 ¶ 12].  If the deputy cannot gauge the severity of the medical need, however, he or she may wait for direction from medical staff before calling 911 [Doc. 37 ¶ 17; Doc. 38 ¶ 13].

The HCSO's training program is approved by the TCI [Doc. 47 at 8].  Deputies are trained on all HCSO policies, including medical policies [Doc. 37 ¶ 36].  And all deputies are required to undergo pre-service training before being placed on duty in the Jail [*Id.* ¶ 5].  This consists of a mix of classroom instruction and self-study [*Id.* ¶ 6].  Since 2016, new corrections deputies have received 240 hours of pre-service training [Doc. 37 ¶ 7].  Since January 2022, the pre-service training has consisted of 260 hours of training [*Id.* ¶ 8].  Deputies also receive at least 48 hours of annual formal training [*Id.* ¶ 10].  Training includes instruction as to how to address medical complaints by detainees and inmates, obvious medical needs regardless of any complaint, and medical emergencies [*Id.* ¶ 12].  All deputies are also trained in basic first aid [Doc. 37 ¶ 18; Doc. 38 ¶ 14; Doc. 46 at 7].

Civilians working at the jail also receive training from jail staff [Doc. 37 ¶ 30].  This training includes how to address medical issues in conjunction with security concerns [*Id.* ¶ 31].

III.    ANALYSIS

Plaintiff maintains that by failing to timely perform any medical evaluation of Mr. Burt until just nine days before his death, despite (1) the fact that he was booked into the Jail following two separate, recent hospitalizations, (2) his visibly precarious medical and mental health conditions, and (3) the repeated efforts of his family and cellmate to procure medical attention for Mr. Burt, Hamilton County, Tennessee (the "County") and Sheriff Jim Hammond, both

13

individually and officially, acted with deliberate indifference to Mr. Burt's constitutional right to "humane living conditions and adequate medical treatment" [Doc. 1 at 1–2]. In response, Defendants seek summary judgment based on their assertion that Plaintiff has failed to present facts from which a reasonable jury could find that (1) a constitutional violation occurred; (2) Defendants were responsible for a policy or custom that caused a violation of Mr. Burt's constitutional rights; or (3) Sheriff Hammond is liable in his individual capacity [Docs. 30 & 31].

Because Mr. Burt was a pretrial detainee at the time of the incidents in the complaint, his treatment is subject to scrutiny under the Due Process Clause of the Fourteenth Amendment, which provides detainees a right to adequate medical care. *Helphenstine v. Lewis Cnty,* 60 F.4th 305, 315 (6th Cir. 2023). To sustain a claim that Defendants deprived Mr. Burt of his right to constitutionally adequate medical attention, Plaintiff must show (1) that Mr. Burt had a sufficiently serious medical needs and (2) Defendants "acted deliberately (not accidentally), [and] also recklessly 'in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known." *Id.* at 317 (quoting *Brawner v. Scott Cnty.*, 14 F.4th 585, 597 (6th Cir. 2021)).

### A. Claims Against the County

Plaintiff maintains that the County is responsible for any constitutional injury suffered by Mr. Burt [Doc. 1]. It is well established that "[a] municipality is a 'person' under 42 U.S.C. § 1983, and so can be held liable for constitutional injuries for which it is responsible." *Morgan v. Fairfield Cnty.*, 903 F.3d 553, 565 (6th Cir. 2018) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). But a municipality's liability lies only for its "*own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). Accordingly, a plaintiff cannot recover against a municipality "for an injury inflicted solely by its employees or agents." *Monell,* 436 at 694. Instead, a municipality may be subject to liability

14

where "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[.]" *Id.* The same holds true for claims against Sheriff Hammond in his official capacity, as suit against him in his official capacity is the equivalent of suit against the County. *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985).

Municipal claims, commonly referred to as *Monell* claims, require a plaintiff to show "an affirmative link between [a municipality's] policy or custom and the particular constitutional violation alleged." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). Thus, to hold a defendant liable under *Monell*, "a plaintiff must identify the policy, connect the policy to the [entity] itself and show that the particular injury was incurred because of the execution of that policy." *Garner v. Memphis Police Dep't*, 8 F.3d 358, 364 (6th Cir. 1993) (citation and internal quotation marks omitted). A plaintiff may demonstrate *Monell* liability in any one of the four following ways:

> (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citation omitted).

In addition to identifying a municipal policy or custom, "[t]he plaintiff must almost demonstrate that, through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 404 (1997). "That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of federal rights." *Id.* This is because "[w]here a court fails to adhere to rigorous requirements of

15

culpability and causation, municipal liability collapses into *respondeat superior* liability." *Id.* at 415.

Plaintiff contends that Defendants bear liability under all four recognized theories of *Monell* liability [Doc. 56 p. 8].

### 1. Illegal Official Policies

When proceeding under the first theory of *Monell* liability, under which a plaintiff must show an "illegal official policy or legislative enactment[,] the plaintiff must show that there were 'formal rules or understandings—*often but not always committed to writing*—that were intended to, and did, establish fixed plans of actions to be followed under similar circumstances consistently and over time.'" *Jackson v. City of Cleveland*, 925 F.3d 793, 829 (6th Cir. 2019) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480–81 (1986)) (alterations omitted). Such "illegal official policy or legislative enactment" may be "1) facially unconstitutional as written or articulated" and/or "2) "facially constitutional but consistently implemented to result in constitutional violations with explicit or implicit ratification by city policymakers." *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (citing *Monell*, 436 U.S. at 692–94). And where the policy is facially lawful, the plaintiff "must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences. A showing of simple or even heightened negligence will not suffice." *Id.* (citing *Bryan Cnty.*, 520 U.S. at 407).

Plaintiff maintains that three written HCSO policies led to Mr. Burt's death: (1) medical policy 90.09.32, which requires medical screenings of arrestees at intake in writing by medical staff; (2) medical policy 90.09.39, which requires a medical assessment of each inmate within 14 days of arrival at the facility; and (3) medical policy 90.09.01, which states that "all clinical decisions and actions regarding health services provided to offenders at the Hamilton County Jail

16

are the sole responsibility of qualified health care professionals" [Doc. 56 at 10]. Plaintiff maintains that these policies were never updated to reflect the operations customs needed to align with TCI and State law requirements [*Id.*]. Plaintiff also contends that correctional officers "routinely used their own discretion" to determine an inmate's access to medical care, failed to timely bring inmates to medical screenings, failed to require medical screenings of arrestees at intake in writing by the medical staff, and that by routinely allowing guards to act as medical providers and triage cases themselves, Defendants were deliberately indifferent [*Id.* at 10–11].

Defendants' policies are facially lawful, as they essentially adopt State-law requirements [*See, e.g.*, Doc. 38 ¶ 6]. And Plaintiff has not cited evidence why an alleged failure by the County to update or improve its policies would make it an obvious risk to an inmate's medical rights. *See Gregory*, 444 F.3d at 752–53 ("[T]he risk of a constitutional violation arising as a result of the inadequacies in the municipal policy must be 'plainly obvious.'"). In fact, Plaintiff's expert, Dr. Haggerty, opines that it is failure to act in accordance with these policies that caused the harm to Mr. Burt and not the content of the policies themselves [Doc. 56 p. ¶ 13].

Moreover, Plaintiff has not presented any proof that the County implemented or applied these policies with deliberate indifference to their known consequences. *See id.* at 752–53 (citing *Bryan Cnty.*, 520 U.S. at 410). While Plaintiff alleges that guards triaged cases, routinely acted as medical providers, failed to transport prisoners for required medical screenings, and/or failed to require medical screenings at intake, she does not present any proof of same. And because Plaintiff has not presented evidence that the County's adoption or implementation of its policies caused the constitutional rights violations alleged, the Court finds Plaintiff has failed to demonstrate that there is a genuine dispute of material fact regarding the applicability of this theory.

17

## 2. Ratification

*Monell* liability under a ratification theory "involves a showing of an illegal policy or custom by demonstrating that an official with final decision-making authority ratified illegal actions." *Alsaada v. City of Columbus*, 536 F. Supp. 3d 216, 270 (S.D. Ohio 2021) (citing *Lipman v. Budish*, 974 F.3d 726, 747 (6th Cir. 2020)). "An official acting with the final decision-making authority may ratify the unconstitutional acts of its employees in two ways": (1) "through 'affirmative approval of a particular decision made by a subordinate[,]" *id.* at 270–71 (citing *Feliciano v. City of Cleveland*, 988 F.2d 649, 650 (6th Cir. 1993), or (2) "by 'failing to meaningfully investigate and punish allegations of unconstitutional conduct[,]'" *id.* at 271 (citing *Wright v. City of Euclid*, 962 F.3d 852, 882 (6th Cir. 2020)).

"Whether an individual is a final policymaker for purposes of § 1983 liability is a question of state or local law, and a showing of policymaking authority typically requires specific evidence that the official's decisions were not subject to review or that the official could set policy related to broad goals." *Tlapanco v. Elges*, 969 F.3d 638, 658 (6th Cir. 2020). Tennessee law "place[s] direct responsibility on a sheriff for the operations of his jail." *Madewell v. Garmon*, 484 F. Supp. 823, 824 (E.D. Tenn. 1980). Therefore, the Court presumes Sheriff Hammond is the appropriately named Defendant official under the ratification theory of municipal liability.

Plaintiff argues that Sheriff Hammond knew that inmates were not receiving proper intakes and timely receiving medical screenings within 14 days of confinement, and that his deliberate indifference to the consequences of those acts "is found in the Sheriff's failure to investigate this incident and punish the responsible parties" [Doc. 56 at 16]. By doing so, Plaintiff contends, the Sheriff "created a custom, constituting official policy, that the written laws and policies need not

18

be followed[,]" and "[i]t is this policy the Courts regard as ratification of the illegal acts" [Doc. 56 at 16–17].

But "[t]o establish *Monell* liability for ratification based on a failure to investigate, a plaintiff needs to show "'not only an inadequate investigation in this instance,' but also 'a clear and persistent pattern of violations' in earlier instances." *Hart v. Michigan*, 138 F.4th 409, 425 (6th Cir. 2025) (quoting *Pineda v. Hamilton Cnty.*, 977 F.3d 483, 494–95 (6th Cir. 2020)). And Plaintiff has not identified any proof in the record of Sheriff Hammond's failure to adequately investigate any similar incidents that would amount to a ratification of unlawful conduct. To the contrary, there is proof in the record that, shortly after the HCSO assumed control over the Jail, the Sheriff and staff began bi-weekly meetings with the medical provider to address concerns and implement improvements for medical care [*See, e.g.,* Doc. 52 at 17–20]. The record reflects that additional funding was provided for medical operations as the need arose, and that 'catch-up' days were planned to address untimely or backlogged screens/visits [*Id.* at 18–20]. Thus, Plaintiff has failed to demonstrate that there is a genuine dispute of material fact that Sheriff Hammond was aware of and failed to address unlawful treatment of inmates' right to medical care so as to support a ratification theory of liability.

### 3.    Failure to Train/Supervise

Under the third *Monell* theory of liability, a plaintiff can "seek to establish that a municipality followed an unofficial custom of inadequately training or supervising the employees who caused the harm." *Gambrel v. Knox Cnty.,* 25 F.4th 391, 408 (6th Cir. 2022). But "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train[,]" *Connick*, 563 U.S. at 61, because an "officer's shortcomings may have resulted from factors other than a faulty training program[,]" *City of Canton,* 489 U.S. at 390–91. It is not

19

sufficient for a § 1983 plaintiff to show that his specific injury could have been prevented or avoided if the municipality had more or better training. *City of Canton*, 489 U.S. at 390–91. Instead, to establish municipal liability under a failure-to-train theory, "a plaintiff must show: '(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.'" *Howell v. NaphCare, Inc.*, 67 F.4th 302, 319 (6th Cir. 2023) (citing *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)).

As an initial matter, Plaintiff has not produced evidence that shows that jail staff training was inadequate. Nor does Plaintiff explain how the quality of training the jail staff received put the County on notice of the likelihood that corrections deputies would respond inadequately to an inmate's medical care. *See Winkler v. Madison Cnty.*, 893 F.3d 877, 903 (6th Cir. 2018) (finding no basis to find County exhibited deliberate indifference by failing to provide additional medical training to jail personnel where no evidence was presented as to what training plaintiff believes personnel should have received, nor did she explain how the quality of training received would put County on notice that personnel would respond inadequately to inmates' medical needs). And Defendants have submitted evidence that the training deputies receive meets or exceeds TCI requirements [Docs. 37 ¶ 4; Doc. 38 ¶ 6].

But even if the Court were to assume that the training provided to correctional deputies at the Jail is inadequate, Plaintiff must prove that the failure to train or supervise is the result of deliberate indifference. To do so, a plaintiff must demonstrate either (1) a "pattern of similar constitutional violations by untrained employees" or (2) "a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Shadrick v.*

20

*Hopkins Cnty.*, 805 F.3d 724, 738–39 (6th Cir. 2015) (internal quotation marks and citations omitted). Plaintiff claims both circumstances are present here, alleging "both an extensive pattern of similar constitutional violations and a single violation that caused Mr. Burt's death, a highly predictable consequence of Defendants' failure to equip [employees] with specific tools to handle recurring situations" [Doc. 56 at 18, citing *Bryan Cnty.*, 520 U.S. at 409].

But Plaintiff has failed to support her allegation that "an extensive pattern of similar constitutional violations" by untrained employees existed, as there is no proof in the record of other similar, related instances where the County was held liable for civil rights violations based on inadequately trained or supervised officers. Accordingly, there is no genuine dispute of material fact as to the applicability of this theory.

As to the "single violation" theory of liability, Plaintiff notes that Sergeant Womack, one of the two individuals who performed training at the jail, was unable to state, for example, policies or the lack of policies regarding how the County enforces the 14-day rule for medical evaluations; whether an officer was required to document if they used their discretion in failing to report a medical complaint to QCHC; and the duty of an intake officer to ensure QCHC personnel are notified of an arrestee's arrival at the Jail from a hospital [Doc. 56 at 18–19]. Plaintiff further argues that the County's failure to ensure inmates received a timely, adequate medical screening placed deputies in the role of medical providers, and the risk of delegating to untrained Jail employees the task of determining when to contact medical staff was patently obvious [Doc. 56 at 19, citing *Sturgill v. Mutrespaw*, No. 1:19-CV-594, 2024 WL 3925663, at *19 (S.D. Ohio Aug. 22, 2024)].

However, there is no evidence in the record that the County's policy of permitting jail officers some discretion as to whether to immediately contact medical personnel in light of their

21

assessment of an inmate's complaints essentially made them stand ins for medical providers. Rather, as evinced by the record, during the relevant time medical personnel were present at each shift at the Jail [Doc. 47 at 10], medical personnel went through the jail approximately three times per day and inmates could request medical attention at that point [Doc. 47 at 17], and inmates had the ability to request medical care through the kiosk [*See, e.g.,* Doc. 38 ¶ 10].

Additionally, that QCHC did not timely complete all medical screenings and/or that Jail staff did not properly complete Mr. Burt's intake forms do not, in and of themselves, comport with the "rigorous standards of culpability and causation" that Plaintiff must meet to hold the County responsible. *Bryan Cnty.*, 520 U.S. at 405. And the record proof is that the majority of intake examinations were performed, and the Sheriff and County took proactive steps (through more funding and/or "catch-up" days) to attempt to remedy the problem with tardy examinations [*See* Doc. 46; Doc. 52]. Further, there is no record proof that the training of jail staff was the cause of any failure to conduct a medical examination of Mr. Burt within the 14-day deadline.

Finally, Plaintiff has not demonstrated that the inadequate training of jail staff caused Mr. Burt's injury. *See Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996). That is, Plaintiff does not cite any admissible evidence in the record that untrained or poorly trained Jail personnel were responsible for Mr. Burt's allegedly inadequate medical care. Moreover, Defendants have presented undisputed proof that the County requires its officers receive initial training and annual training in accordance with relevant law enforcement requirements, and Plaintiff has failed to present any proof from which a jury could reasonably find that that training is inadequate. Accordingly, Plaintiff has failed to demonstrate that there is a genuine dispute of material fact regarding the applicability of this theory.

22

### 4.    Custom of Known Tolerance

To state a "custom of tolerance or acquiescence" under the fourth *Monell* theory of liability, Plaintiff must prove:

(1) the existence of a clear and persistent pattern of unconstitutional conduct;
(2) notice or constructive notice on the part of the [County];
(3) the [County's] tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction; and
(4) that the [County's] custom was the "moving force" or direct causal link in the constitutional deprivation.

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Doe*, 103 F.3d at 508).

Plaintiff argues that "[t]he lack of provision of intake medical screenings, the guards' usage of their own discretion to triage medical complaints, and the lack of a medical provider at the time of intake were such pervasive and accepted practices and customs at the Jail that they take on the force of a municipal policy" [Doc. 56 at 12]. But these allegations are not supported with any evidence. And there is no proof in the record of a previous finding of unconstitutional behavior by a County officer regarding an inmate's access to medical care.[7]

And even if the record could suggest unconstitutional conduct by an individual actor, Plaintiff has not demonstrated a County custom or policy was the "moving force" of any constitutional deprivation in this case. *Thomas*, 398 F.3d at 429. While there is no "Receiving Screening" form in Mr. Burt's file, failure to complete one does not rise to a constitutional

---

[7] Plaintiff's complaint alleges various incidents at the Jail to support what she deems a history of medical neglect by the County [*See* Doc. 1]. But Plaintiff's complaint is unsworn, and thus, the Court does not consider the allegations therein evidence for purposes of summary judgment. *Farr v. Centurion of Tennessee, LLC*, No. 21-5094, 2022 WL 18457630, at *1 (6th Cir. Aug. 1, 2022) (noting that the "district court . . . properly declined to consider as evidence the allegations in [the plaintiff's] complaint and the arguments in his responses to the motions for summary judgment . . . because his complaint was not verified and his responses were not sworn or submitted under penalty of perjury").

23

violation, as (1) there is no evidence of a deliberate failure to complete a form for Mr. Burt, and (2) there is no evidence of a systematic refusal by medical staff to obtain the necessary information from inmates and execute those forms. The record contains no evidence of prior instances where inmates received constitutionally inadequate medical care, either in toto or specifically as related to inmate intake medical examinations. Defendants' policy of requiring a medical screening within 14 days of arrival at the Jail comports with State standards, and, as previously noted, tardiness in those screenings was identified by both QCHC staff and the Sheriff and addressed through regular meetings and the grant of funding requests for additional help where needed [*See, e.g.*, Doc. 68-1]. Accordingly, this record does not create a genuine dispute of material fact regarding the applicability of this theory.

In sum, the Court finds there is not sufficient evidence to raise a jury issue as to whether Mr. Burt's death was attributable to unconstitutional conduct by the County. *Morgan*, 903 F.3d at 555 (noting that the different approaches to municipal liability all answer "the same fundamental question: did the municipality cause the harm or did an individual actor?"). Accordingly, the County is entitled to summary judgment.

## B. Sheriff Hammond

Plaintiff contends that Sheriff Hammond bears individual liability for the injuries sustained by Mr. Burt under a theory of supervisory liability [*See* Doc. 56 at 22]. To prevail on a theory of supervisory liability, Plaintiff must "show that the [supervisor] at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (quoting *Hays v. Jefferson Cnty.*, 668 F.2d 869, 874 (6th Cir. 1982)); *see also Cardinal v. Metrish*, 564 F.3d 794, 802–03 (6th Cir. 2009) ("We have held that, even if a plaintiff can prove a violation of his constitutional rights, his § 1983

24

claim must fail against a supervisory official unless 'the supervisor encouraged the specific incident of misconduct or in some other way directly participated in it.'" (quoting *Combs v. Wilkinson*, 315 F.3d 548, 558 (6th Cir. 2002))). Therefore, Plaintiff must submit evidence that Sheriff Hammond "did more than play a passive role in the alleged violation . . . . [as] [s]upervisory liability under § 1983 cannot attach where the allegation of liability is based upon a mere failure to act." *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999).

Plaintiff argues that Sheriff Hammond's conduct satisfies a supervisory liability standard, as he was aware that inmates were not receiving medical intake screenings and failed to act to mitigate the risk posed to inmates by their failure to receive that care [Doc. 56 p. 23–24, citing *Brawner*, 14 F.4th at 597]. Specifically, Plaintiff alleges that Sheriff Hammond "knowingly prevented inmates' access to a required medical intake screening, allowed guards to routinely triage medical care for inmates, and failed to ensure medical providers were present at intake" [Doc. 56 p. 25]. But Plaintiff has not pointed to any proof in the record to support these allegations. And, as the Court noted above, the record demonstrates that (1) intake medical screenings were routinely taking place at the Jail, even if there was not a timely intake screening in Mr. Burt's case [*See, e.g.,* Doc. 46 at 27; Doc. 52-11]; and (2) Sheriff Hammond generally met biweekly with QCHC to attempt to address issues with medical care [Doc. 46-4; Doc. 46-5; Doc. 68-1 at 7–8]. Accordingly, Plaintiff has not presented evidenced that Sheriff Hammond "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of" a subordinate, *Shehee*, 199 F.3d at 300, and he is entitled to summary judgment as to the personal liability claim against him.

## IV.    CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment [Doc. 30] will be **GRANTED**, and this action will be **DISMISSED WITH PREJUDICE**.

25

**SO ORDERED.**

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

_/s/ Charles E. Atchley, Jr._
**CHARLES E. ATCHLEY, JR.**
**UNITED STATES DISTRICT JUDGE**